UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
HICKSVILLE WATER DISTRICT,

                Plaintiff,

- against -                  **MEMORANDUM & ORDER**
                                                                    19-CV-6070 (PKC) (SMG)

JERRY SPIEGEL ASSOCIATES, INC., *et al.*,

                Defendants.
---------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Plaintiff brings this action against thirty-three Defendants[1] for state law claims of public nuisance, negligence, failure to warn, trespass, and private nuisance. (*See generally* Complaint ("Compl."), Dkt. 1-2.) Defendant Osram Sylvania Products, Inc. ("Osram Sylvania") removed this action to federal court based on federal-officer jurisdiction. (Dkt. 1.) Plaintiff now moves to remand the case to New York State Supreme Court. (Dkt. 61.) For the reasons stated below, the Court denies Plaintiff's motion to remand.

---

[1] Plaintiff brings this action against Jerry Spiegel Associates, Inc., E-Z-EM, Inc., Arkwin Industries, Inc., 1st State, LLC, Tishcon Corp., C&O Realty Corp., Westbury Jeep, Chrysler, Dodge, Inc., William A. Gross Construction Associates, Inc., Grand Machinery Exchange, Inc., Advance Food Services Equipment, Inc., IMC Eastern Corporation, ALSY Manufacturing, LBA Properties, Inc., MATCO Service Corp., ADCHEM Corp, Efficiency Systems Co., Inc., Hubbert Freund Woodworking Company Incorporated, Korg U.S.A. Inc., Huron Tool & Cutter Grinding Co., Inc., Royal Guard Fence Co., Inc., Metpar Corp., Blen-Cal Electronics Industrials, Inc., B&G Lighting, Utility Manufacturing Co., Inc., Avanel Industries, Inc., Island Transportation Corporation, Nest Equities, Osram Sylvania Products, Inc., GTE Corporation, FUJIFILM North America Corporation, Anchor/Lith-Kem-Ko, Inc., Vishay GSI, Inc., and Air Techniques, Inc.

1

**BACKGROUND**[2]

**I.     Relevant Facts**

Various water wells that belong to Plaintiff "were contaminated by 1,4-Dioxane that was purchased, consumed, transported, used, processed, mixed, stored, handled and/or disposed of by Defendants and/or otherwise permitted to migrate from Defendant[s'] properties." (Compl., Dkt. 1-2, ¶ 2.)[3] "1,4-Dioxane has been detected in Plaintiff's aquifer system, and within its production wells." (*Id.* ¶ 6.) "1,4-Dioxane is a highly toxic substance" and "was mainly used as[, *inter alia*,] a laboratory cryoscopic solvent for molecular mass determinations and in Trichloroethylene (TCE), a degreaser for metal parts." (*Id.* ¶¶ 11–12.) Defendants "knew or reasonabl[y] should have known that [1,4-Dioxane] would inevitably reach groundwater, significantly pollute drinking water wells, render drinking water unusable and unsafe, and threaten the public health and welfare." (*Id.* ¶ 3.)

Plaintiff alleges that various Defendants and their predecessors, successors, parents, subsidiaries, affiliates, and divisions used, *inter alia*, TCE and other solvents for various purposes.

---

[2] The following facts are drawn from the Complaint, the Notice of Removal and the exhibits attached thereto, and materials the parties submitted related to this motion. *Maguire v. A.C. & S., Inc.*, No. 14-CV-7578 (PAE), 2015 WL 4934445, at *1 n.1 (S.D.N.Y. Aug. 18, 2015) ("In resolving this motion, the Court treats all facts alleged in these pleadings as true. . . . The Second Circuit [] has said that, on jurisdictional issues, federal courts may look outside the pleadings to other evidence in the record, and therefore the court will consider material outside of the pleadings submitted on a motion to remand." (internal quotation marks and citations omitted)). Any citations to the Complaint, the Notice of Removal, and motion papers incorporate by reference the documents cited therein. Where relevant, however, the Court may cite directly to the underlying document.

[3] "Plaintiff's wells draw from the Magothy aquifer beneath Nassau County to provide drinking water to" the community. (Compl., Dkt. 1-2, ¶ 5.) In 1978, the United States Environmental Protection Agency designated the Long Island aquifer system as a sole source aquifer under the Safe Drinking Water Act. (*Id.* ¶ 4.) "A sole source aquifer is an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health." (*Id.* (internal quotation marks omitted).)

(*See id.* ¶¶ 45–128; *see also id.* ¶ 42 ("Any and all references to a Defendant or Defendants in this Complaint include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.").)

Defendants Osram Sylvania and GTE Corporation (collectively, the "Sylvania Defendants")

> owned and/or operated, in Plaintiff's water district, a nuclear materials processing facility in the 70-140 Cantiague Rock RD/Former Sylvania [Electric Products, Inc. ("Sylvania")] Site, a State Superfund Site, located at 70-140 Cantiague Rock Road, Hicksville, New York. This site has been used for a variety of commercial and industrial activities including the manufacture of nuclear fuel elements for research and electric power generation reactors.

(*Id.* ¶¶ 112–16.) "Portions of this nuclear fuel work was done for the US government under federal contract." (*Id.* ¶ 128.) "On December 10, 1951, [the Atomic Energy Commission (the "AEC")] entered into a classified initial letter agreement . . . and contract [the "Sylvania contracts"] . . . with Sylvania." (Notice of Removal, Dkt. 1, ¶ 14.) The AEC "specified the type of fuel element Sylvania had to produce and the methods of production" and retained title to all property purchased by or furnished to Sylvania for the contract as well as "all products, by-products, wastage, salvage, work-in-process, residues and scrap resulting from all Government-owned property under the contract." (*Id.* ¶ 15 (internal quotation marks omitted); *see also* Davenport Decl., Dkt. 70-2, ¶¶ 6–7.) "Sylvania was not permitted to alter the Sylvania Facility without the Government's approval" and "was required to keep the Government apprised of its performance through detailed accounts and reports." (Notice of Removal, Dkt. 1, ¶ 15.) The product was "subject to the general supervision of [AEC] and [AEC] authorizations, approvals and directions." (*Id.* (brackets in original).) "The AEC required that the uranium fuel elements be nickel-plated, cleaned with solvents such as trichloroethylene and perchloroethylene, and encased in aluminum[;] . . . [i]t was important to the AEC that the fuel elements be cleaned with highly-effective solvents because

3

impurities could cause severe consequences." (Davenport Decl., Dkt. 70-2, ¶¶ 6, 8; *see also* Andree Decl., Dkt. 70-6, ¶ 7.) "Uranium, thorium, tetrachloroethene (including 1,4-Dioxane), and nickel present in the processing waste had been discharged to recharge basins and leaching pools." (Compl., Dkt. 1-2, ¶ 128.) The Sylvania Defendants' operations "have contaminated Plaintiff's well 4-2." (*Id.* ¶¶ 113, 115.) "Primary contaminants in soil and groundwater included tetrachlor[o]ethene, trichloroethene, and their breakdown products. It would have also included 1,4-Dioxane." (*Id.* ¶ 116.)

Defendant Vishay GSI, Inc. ("Vishay") operates at the site where General Instruments Corp. ("GIC")[4] used to be located and where "prior uses of a variety of solvents and acids during the production of microelectronic components have led to site and groundwater contamination." (*Id.* ¶¶ 123–25.) Between 1960 and 1993, GIC manufactured various electronic components under contract with several departments and agencies of the federal government. (Vishay Brief ("Vishay Br."), Dkt. 67, at 4–5.) "The effluent from production was discharged into a waste lagoon and drywells. On-Site soils and groundwater revealed chlorinated and petroleum volatile organic compounds (VOCs), including tetrachloroethene, trichloroethene, 1-2-diclorobenzene, ethylbenzene, xylene, [and] vinyl chloride contamination. It would have also included 1,4-Dioxane." (Compl., Dkt. 1-2, ¶ 125.)

## II.    Procedural History

On September 23, 2019, Plaintiff filed this action in the Supreme Court of New York, Nassau County. (*See generally* Compl., Dkt. 1-2.) On October 9, 2019, Plaintiff served Defendant Osram Sylvania with the summons and complaint, and on October 29, 2019, Defendant Osram

---

[4] GIC operated at the site between 1960 and 1993, and Vishay thereafter became a "successor-in-interest" to General Semiconductor, Inc., which was, in turn, a "successor-in-interest" to GIC. (*See* Vishay Br., Dkt. 67, at 3.)

4

Sylvania removed the action to this Court pursuant to 28 U.S.C. § 1442(a), which permits removal of actions directed at the United States or its agencies or officers thereof. (*See* Notice of Removal, Dkt. 1.) On December 6, 2019, Plaintiff filed the motion to remand. (Dkt. 61.) Defendant GTE Corporation joined Defendant Osram Sylvania in its response to the motion. (Dkt. 70.) Defendant Vishay also filed a response, asserting independent grounds for federal-officer jurisdiction. (Dkt. 67.) Plaintiff's remand motion was fully briefed on December 31, 2019. (Dkt. 71.)

## DISCUSSION

In seeking remand, Plaintiff argues that Defendant Osram Sylvania's removal of this matter pursuant to 28 U.S.C. § 1442(a)(1) was improper, because the Sylvania Defendants, along with Defendant Vishay (collectively, the "Federal Officer Defendants"), do not qualify as "federal officers" for purposes of the statute. The Sylvania Defendants and Defendant Vishay counter that they, in fact, qualify as federal officers under Section 1442(a)(1), that removal was therefore proper, and that Plaintiff's remand motion should be denied. The Court agrees with the Federal Officer Defendants.

**I.     Legal Standard**

The federal-officer removal statute, 28 U.S.C. § 1442(a)(1), provides that a case may be removed from state to federal court when the case is brought against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "As a general matter, the defendant bears the burden of demonstrating the propriety of removal." *Gordon v. Air & Liquid Sys. Corp.*, 990 F. Supp. 2d 311, 316 (E.D.N.Y. 2014) (internal quotation marks omitted) (quoting *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994)). For defendants who are not themselves federal officers,

5

they must show: "[f]irst, . . . that they are persons within the meaning of the statute who acted under a federal officer[;] [s]econd, . . . that they performed the actions for which they are being sued under color of federal office[;] [and t]hird, they must raise a colorable federal defense." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008) (internal quotation marks, alterations, and citations omitted).

## II.   Application

As a general matter, Plaintiff argues that the removal statute should be strictly construed (Pl.'s Br., Dkt. 61-6, at 6–7), but in doing so Plaintiff "misses the distinction between the general removal statutes, which are to be strictly construed, and federal-officer removal, which 'should not be frustrated by a narrow, grudging interpretation.'" *Gordon*, 990 F. Supp. 2d at 316 (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).  Rather, "[t]he federal[-]officer removal statute must be construed broadly because 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see Isaacson*, 517 F.3d at 136 ("[T]he statute as a whole must be liberally construed.").

The Court analyzes each of the requirements set forth in *Isaacson*, 517 F.3d at 135, in turn.[5]

---

[5] Because the Court finds for the reasons stated below that the Sylvania Defendants satisfy the requirements for federal-officer jurisdiction, the Court does not examine in detail Defendant Vishay's federal-officer status.  In addition, the Court notes that Defendant Vishay relies on its predecessor GIC's company reports and various letters (that merely describe the existence of a supply relationship between the company and the government), but has not submitted actual contracts for any specific product GIC produced for the federal government or any declaration of a company employee attesting to the special relationship that existed between GIC and the government.  It is unclear whether GIC manufactured electronic components according to special government specifications. (*See, e.g.*, Vishay Br., Dkt. 67, at 5 ("In 1965, GIC's Microelectronics Division developed a pilot line for production of metal-oxide-silicon (MOS) monolithic microcircuits for both military and commercial applications.").)  The most government control

### A.  Persons Acting Under A Federal Officer

Plaintiff does not dispute that the Sylvania Defendants, both corporations, are persons for the purposes of the federal-officer removal statute. (Pl.'s Br., Dkt. 61-6, at 9; *see* Pl.'s Reply, Dkt. 71-3, at 7.) The Second Circuit has indeed held that "the term 'person' includes corporate persons." *Isaacson*, 517 F.3d at 136. Plaintiff, however, argues that the Sylvania Defendants were not acting under a federal officer. (Pl.'s Br., Dkt. 61-6, at 9–12.) The Court disagrees. "The words 'acting under' are to be interpreted broadly." *Isaacson*, 517 F.3d at 136. "[A]n entity acts under a federal officer when it assists, or helps carry out, the duties or tasks of the federal superior. In other words, there must exist a special relationship between the two." *Isaacson*, 517 F.3d at 137 (internal quotation marks, alterations, and citation omitted) (quoting *Watson v. Philip Morris Cos, Inc.*, 551 U.S. 142, 151 (2007)). "*Isaacson* found this element satisfied where the defendant was a private contractor supplying the [g]overnment with a product it needed during war—'a product that, in the absence of [d]efendants, the [g]overnment would have had to produce itself.'" *Gordon*, 990 F. Supp. 2d at 317 (quoting *Isaacson*, 517 F.3d at 137).

Here, the AEC contracted with Sylvania to research and develop nuclear material between 1951 and 1965, similar in nature to the contracts for Agent Orange in *Isaacson* and Navy ship components in *Gordon*. The AEC also closely controlled and supervised the work performed by the Sylvania Defendants for the agency. The AEC "specified the type of fuel element Sylvania had to produce and the methods of production" and retained title to all property purchased by or furnished to Sylvania for the contract as well as "all products, by-products, wastage, salvage, work-

---

shown in Defendant Vishay's exhibits extends to GIC employees' enjoyment of occupational deferment, the presence of resident government inspectors, and training in unspecific methods certified by the government. In sum, the Court finds the evidence submitted by Defendant Vishay too ambiguous and thus insufficient to allow the Court to assess the relationship between GIC and the government.

in-process, residues and scrap resulting from all Government-owned property under the contract." (Notice of Removal, Dkt. 1, ¶ 15 (internal quotation marks omitted); *see also* Davenport Decl., Dkt. 70-2, ¶¶ 6–7.) "Sylvania was not permitted to alter the Sylvania Facility without the Government's approval" and "was required to keep the Government apprised of its performance through detailed accounts and reports." (Notice of Removal, Dkt. 1, ¶ 15.) The product was "subject to the general supervision of [AEC] and [AEC] authorizations, approvals, and directions." (*Id.* (brackets in original).) The AEC's control extended to mandating the type of hand soap used in the restrooms. (Andree Decl., Dkt. 70-6, ¶ 6.) "Such control exceeds mere compliance with government regulation, and establishes the first prong of the test showing the propriety of removal."[6] *Depascale v. Sylvania Elec. Prods., Inc.*, 584 F. Supp. 2d 522, 527 (E.D.N.Y. 2008). Thus, the Sylvania Defendants have sufficiently established both that Sylvania supplied the federal government with a product that, in Sylvania's absence, the federal government would have had to produce itself, and that there was "extensive government control over the operation." *Id.*

Plaintiff's arguments to the contrary are off-point and unavailing. Plaintiff argues that the federal defense would not apply to the discharge of 1,4-Dioxane that occurred at other periods in time and would not cover the entire Sylvania site. (Pl.'s Br., Dkt. 61-6, at 10.) However, whether the defense completely or partially absolves the Sylvania Defendants is irrelevant to the jurisdictional question, "as the purpose of the statute is to [ensure] that the validity of the defense

---

[6] Although the Court addressed the degree of government control in the context of the first prong, it may also be appropriate to addresse it as part of the second prong. As recognized by the Second Circuit, the first and second prongs of the *Isaacson* test "tend to collapse into a single requirement: that 'the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations'" and that "[c]ritical under the statute is to what extent defendants acted under federal direction at the time they were engaged in the conduct now being sued upon." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("MTBE")*, 488 F.3d 112, 124–25 (2d Cir. 2007) (citations omitted). Nevertheless, the Court analyzes the two prongs separately as other courts have in this Circuit.

will be tried in federal court." *Isaacson*, 517 F.3d at 139. Plaintiff also argues that the degree of government control was insufficient, because the Sylvania contracts did not specifically regulate, *inter alia*, the disposal of waste materials. (Pl.'s Br., Dkt. 61-6, at 11–12.) But, as discussed above, the Sylvania Defendants have "produced more than sufficient documentation attesting to the extensive government control over the operation." *Depascale*, 584 F. Supp.2d at 527.

Accordingly, the Court finds that the Sylvania Defendants meet the first requirement of the *Isaacson* standard.

### B. Under Color of Federal Office

"The second prong requires Defendants to show that the acts complained of . . . were taken 'under color of [federal] office'" and "has come to be known as the causation requirement." *Isaacson*, 517 F.3d at 137 (citation omitted) (quoting 28 U.S.C. § 1442(a)(1)). "The hurdle erected by this requirement is quite low." *Id.* "To show causation, [d]efendants must only establish that the act that is the subject of [p]laintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Id.* at 137–38 (emphasis in original) (citations omitted). Courts must "credit [d]efendants' theory of the case when determining whether a causal connection exists." *Id.* at 137 (citation omitted).

Plaintiff argues that the degree of government control was insufficient, because the Sylvania contracts did not specifically direct the production and disposal of waste materials. (Pl.'s Br., Dkt. 61-6, at 11–12.) However, courts have rejected precisely this argument in cases of government contractors. *See Isaacson*, 517 F.3d at 138 ("[E]ven if Plaintiffs were to prove that the dioxin contamination occurred because of an act not specifically contemplated by the government contract, it is enough that the contracts gave rise to the contamination."); *Ayo v. 3M Co.*, No. 18-CV-373 (JS) (AYS), 2018 WL 4781145, at *9 (E.D.N.Y. Sept. 30, 2018) ("To satisfy

9

the causation requirement, [the manufacturing defendants] need only show that the conduct at issue occurred during their performance of the government-directed action, even if the government did not call for the complained-of act." (citation omitted)); *Gordon*, 990 F. Supp. 2d at 318 ("Plaintiff argues at various points that defendants have not identified regulations or contract terms in which the Navy mandated the use of asbestos, but defendants may satisfy this element without reference to specific Navy requirements."). *Isaacson* explained that "whether the challenged act was outside the scope of [d]efendants' official duties, or whether it was specifically directed by the federal [g]overnment, is one for the federal—not state—courts to answer." *Isaacson*, 517 F.3d at 138 (citing *Willingham*, 395 U.S. at 409). In other words, Plaintiff's argument only goes to the merits of the defense, while the existence of the question—whether Defendants' federal contractor status provides a defense to liability—is sufficient to pass the "quite low" threshold of federal-officer removal. *Id.* at 137.

Plaintiff's reliance on *In re Methyl Tertiary Butyl Ether Product Liability Litig. ("MTBE")*, 488 F.3d 112, 132 (2d Cir. 2007), is also misplaced, because *MTBE* analyzed "entities regulated by—though not acting under—officers or agencies of the United States" and found that, under such circumstances, the defendant entities did not act under a federal officer where the use of a chemical was not mandated by federal regulations. *Id.* at 131–32. The *MTBE* court indeed emphasized that "in most instances, a contract, principal-agent relationship, or near-employee relationship with the government will be necessary to show the degree of direction by a federal officer necessary to invoke removal under 28 U.S.C. § 1442(a)(1)." *Id.* at 131 (citation omitted).

Crediting the Sylvania Defendants' theory of the case, the alleged disposal of 1,4-Dioxane "occurred *because of* what they were asked to do by the [g]overnment"—to manufacture nuclear material. *See Isaacson*, 517 F.3d at 138. "The AEC required that the uranium fuel elements be .

10

. . . cleaned with solvents such as trichloroethylene and perchloroethylene" to avoid impurities, which resulted in the presence of 1,4-Dioxane. (Davenport Decl., Dkt. 70-2, ¶¶ 6, 8; *see also* Andree Decl., Dkt. 70-6, ¶ 7.) "[T]hat is enough regardless of whether . . . any contract called for the use of" 1,4-Dioxane. *See Ayo*, 2018 WL 4781145, at *9 (citing *Isaacson*, 517 F.3d at 137–38); *see also Gordon*, 990 F. Supp. 2d at 318 ("[D]efendants made their products because the Navy agreed to procure them[;] [t]hus, there is evidence in the record that would allow defendants' conduct to fall under the color of a federal office regardless of whether there were contractual terms concerning asbestos.").

Accordingly, the Court finds that the Sylvania Defendants meet the second requirement of the *Isaacson* standard.

### C. Colorable Federal Defense

"Finally, Defendants must raise a colorable federal defense." *Isaacson*, 517 F.3d at 138 (citation omitted). "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to [ensure] that the validity of the defense will be tried in federal court." *Id.* at 139 (quoting *Willingham*, 395 U.S. at 407). Courts in this Circuit have found that "[a]dequately supported affidavits are sufficient to establish a colorable federal defense." *Gordon*, 990 F. Supp. 2d at 318 (alterations in original) (collecting cases). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo v. Crane Co.*, 771 F.3d 113, 116 (2d Cir. 2014) (quoting *Willingham*, 395 U.S. at 409). "The inquiry on the motion to remand is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Id.* "[T]he district court's role on a remand motion is not to resolve whether

11

the defendant has established the federal contractor defense or to resolve factual disputes, but only to ensure the existence of some competent evidence supporting a 'colorable' federal defense." *Id.* at 117.

The parties dispute whether the Sylvania Defendants have shown a colorable federal contractor defense.

> The federal contractor defense displaces state-law design and manufacturing duties "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."

*Gordon*, 990 F. Supp. 2d at 318 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). "The defense overrides duties imposed by state law to protect 'the government's discretionary authority over areas of significant federal interest such as military procurement.'" *Ayo*, 2018 WL 4781145, at *10 (citations omitted).

> The first two requirements assure that the suit from which protection is sought is within the area where the policy of the discretionary function would be frustrated— *i.e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third requirement is imposed because in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

*In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 88 (2d Cir. 2008) (internal quotation marks, alterations, and citations omitted).

### 1. Approval of Reasonably Precise Specifications

"[I]t is necessary only that the government approve, rather than create, the specifications[.]" *Id.* at 91 (citation omitted). "[E]ven if the defendants contributed significantly 'in suggesting specifications,' '[t]he government exercises adequate discretion over the contract specifications to invoke the defense if it independently and meaningfully reviews the

specifications.'" *Ayo*, 2018 WL 4781145, at *10 (quoting *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d at 91).

Plaintiff argues that the Sylvania contracts "make absolutely no mention of the cleaning solvents, degreasers, or other chemicals that may be used in the operation," and, thus, that the government did not approve reasonably precise specifications. (Pl.'s Br., Dkt. 61-6, at 14; *see* Pl.'s Reply, Dkt. 71-3, at 6.) Plaintiff's argument misconstrues the standard. *See Albrecht v. A.O. Smith Water Prods.*, No. 11-CV-5990 (BSJ), 2011 WL 5109532, at *4 (S.D.N.Y. Oct. 21, 2011) (rejecting plaintiff's argument that the government contract must specifically call for the use of the harmful substance). "To establish jurisdiction under § 1442, [defendant] need not prove its defense but need only show that it has the underpinnings of a valid federal defense." *Id.* (citation omitted). This requirement is satisfied if defendant can show, with the support of affidavits or declarations, "the meticulous specifications and scrupulous control that the [government] exerted over its manufacturing." *Id.*

Here, the Sylvania Defendants have submitted declarations attesting that "the AEC prescribed detailed specifications for the uranium fuel elements produced by" Sylvania and "imposed detailed guidelines and instructions on the exact production process that had to be used to manufacture the uranium fuel elements," sometimes rejecting Sylvania's proposals (Davenport Decl., Dkt. 70-2, ¶ 6; *see also* Cohen Decl., Dkt. 70-5, ¶ 6); that "[t]he AEC required that the uranium fuel elements be nickel-plated, cleaned with solvents such as trichloroethylene and perchloroethylene, and encased in aluminum[;] . . . [i]t was important to the AEC that the fuel elements be cleaned with highly-effective solvents because impurities could cause severe consequences" (Davenport Decl., Dkt. 70-2, ¶¶ 6, 8; *see also* Andree Decl., Dkt. 70-6, ¶ 7); and that the AEC also regularly inspected and tested the products (*see* Davenport Decl., Dkt. 70-2, ¶ 8;

Andree Decl., Dkt. 70-6, ¶ 8). Plaintiff itself indeed alleges that during Sylvania's production, "[u]ranium, thorium, tetrachloroethene (including 1,4-Dioxane), and nickel present in the processing waste had been discharged to recharge basins and leaching pools." (Compl., Dkt. 1-2, ¶ 128.) Viewed in the light most favorable to the Sylvania Defendants, the evidence suggests that the AEC exercised adequate discretion over the product specifications and compelled the use of solvents. Therefore, the AEC's control "went far beyond mere 'rubber stamping,' and is sufficient to make colorable a claim that 'government officials ultimately remained the agents of decision.'" *Albrecht*, 2011 WL 5109532, at *4 (alterations and citation omitted).

## 2. Conformity to the Specifications

Plaintiff argues that, because the Sylvania Defendants do not allege that their "equipment conformed to government specifications," they cannot demonstrate any conflict between a "federal interest in this case" and Plaintiff's claim of negligence regarding the Sylvania Defendants' use and disposal of a toxic substance. (*See* Pl.'s Br., Dkt. 61-6, at 15 ("[Sylvania's] negligent use and disposal of a toxic substance was a breach of [the] standard of care under the state law, which is not in conflict with the federal interest in this case[,]" because "the Contract does not show that the federal government had a significant interest in using any specific solvents in Defendant's operations.").) Though couched in terms of "equipment" specifications, this argument is no different than the one rejected by the Court in the context of the first element of the federal contractor defense, *i.e.*, that the government did not require Sylvania to use solvents containing 1,4-Dioxane, that Sylvania could have performed the government contract without using these solvents, and that thus there is no conflict between the federal interest and the relevant standard of care under state law. Accordingly, the Court rejects this argument for the same reasons stated above.

To the extent that Plaintiff is arguing that the Sylvania Defendants failed to show that the manufacturing process or the products conformed to government specifications (Pl.'s Br., Dkt. 61-6, at 15 ("Defendant does not allege that Sylvania's equipment conformed to government specifications, either pursuant to the Contract, or otherwise.")), there is colorable evidence that the products conformed to the government's specifications. The AEC regularly inspected the production and performed quality control tests before acceptance. (*See* Davenport Decl., Dkt. 70-2, ¶ 8; Andree Decl., Dkt. 70-6, ¶ 8.) Thus, the evidence suggests that the government "would not have accepted [the product] had it not conformed to those specifications." *Cuomo*, 771 F.3d at 117; *see Gordon*, 990 F. Supp. 2d at 319 ("[T]he evidence of the Navy's acceptance and use of defendants' products, after the rigorous trial and approval process described in the affidavits, supports defendants' assertion that they conformed to the reasonably precise specifications." (citation omitted)).

### 3. Warning About Known Dangers

"A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" *Albrecht*, 2011 WL 5109532, at *5 (citation omitted). Here, "[t]he AEC required that the uranium fuel elements be . . . cleaned with solvents such as trichloroethylene and perchloroethylene." (Davenport Decl., Dkt. 70-2, ¶ 6.) Given the AEC's "scrupulous control" over the production, *Albrecht*, 2011 WL 5109532, at *4, the evidence is sufficiently colorable to suggest that the AEC was at least as aware of the accompanying risks as Sylvania was, *see DePascale v. Sylvania Elec. Prods., Inc.*, 510 F. App'x 77, 81 (2d Cir. 2013) (summary order) (reasoning, on an appeal of district court's order for a new trial, that "the evidence show[ed] that the AEC understood and approved the use of these

15

solvents, and by implication, was aware of their accompanying risks").[7]  Notably, Plaintiff, while alleging that Defendants knew, or should have known, the risks associated with the solvents, does not allege that Defendants knew more than the government did.  To the extent that Plaintiff "challenges the factual sufficiency of the [] defense," the Court emphasizes that the Sylvania Defendants "should have the opportunity to present [their] version of the facts to a federal, not a state, court" and that the district court is not "required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue."  *Cuomo*, 771 F.3d at 116 (internal quotation marks and citation omitted).

Accordingly, the Court finds that the Sylvania Defendants have submitted "[a]dequately supported affidavits [] sufficient to establish a colorable federal defense."  *Gordon*, 990 F. Supp. 2d at 318 (citation omitted).  Plaintiff's arguments mainly focus on whether the government mandated the use and method of disposal of solvents that contained 1,4-Dioxane, which may have merit at a later stage, but "ask[s] more of defendants at this stage than Section 1442(a)(1) requires." *Id.* at 320.  "[I]f it later becomes evident that the relevant facts developed in the litigation do not support jurisdiction, the Court will do what it would do in any removed case: dismiss and remand the action based on lack of subject matter jurisdiction."  *Id.* (citation omitted).

\*       \*       \*

---

[7] The Sylvania Defendants seem to be relying on the factual findings of this previous litigation against the Sylvania Defendants.  (Sylvania Br., Dkt. 70, at 18 ("Here, there was no need to warn the government because the Government was already aware of and understood the solvents' accompanying risks." (citing *DePascale*, 510 F. App'x at 81)).)  However, "a court may only take judicial notice of documents from prior proceedings 'to establish the fact of such litigation and related filings' and 'not for the truth of the matters asserted in the other litigation.'" *Cabrera v. Schafer*, 178 F. Supp. 3d 69, 73 (E.D.N.Y. 2016) (citations omitted).  Here, the Court does not take notice of the factual findings in *DePascale* for their truth, but merely adopts the *DePascale* court's legal reasoning regarding the Sylvania Defendants' right to be heard on their potential federal defense in a federal court.

In sum, the Court finds that the Sylvania Defendants have sufficiently established federal-officer jurisdiction.

## CONCLUSION

For the reasons stated above, the Court denies Plaintiff's motion to remand. In accordance with the Court's previous scheduling order, (1) Defendants shall either file their answers, crossclaims, counterclaims, and third-party complaints (if not already filed), or their motions to dismiss Plaintiff's complaint by July 13, 2020; (2) any party seeking to dismiss a crossclaim, counterclaim, or third-party claim shall file a pre-motion conference request by August 10, 2020 as required by the Court's Individual Rules, with responses to be filed within seven (7) days thereafter as required by the Court's Rules. With respect to any motion to dismiss Plaintiff's complaint,[8] Plaintiff shall have thirty (30) days thereafter to respond to the motion to dismiss, and Defendants shall have fourteen (14) days after Plaintiff's response to file a reply, if any.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: June 12, 2020
      Brooklyn, New York

---

[8] Various Defendants have filed pre-motion conference requests in connection with anticipated motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Those requested have been denied as unnecessary by the Court. (Nov. 27, 2019 Order.) On November 22, 2019, Defendant ADCHEM Corp. filed a pre-motion conference request, joining other Defendants in their request seeking to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 49.) The Court now denies the request as unnecessary. Defendant ADCHEM Corp. shall follow the briefing schedule set out here for its motion to dismiss.